UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

HAROLD A. FLORES,

Plaintiff,

- against -

ENTERGY NUCLEAR OPERATIONS, INC.,

Defendant.

**OPINION & ORDER**

16-CV-7207 (CS)

Appearances:

Amy L. Bellantoni
The Bellantoni Law Firm, PLLC
Scarsdale, New York
*Counsel for Plaintiff*

Jonathan M. Kozak
Benjamin J. Yeamans
Jackson Lewis P.C.
White Plains, New York
*Counsel for Defendant*

Seibel, J.

Before the Court are the motion for summary judgment, (Doc. 37), and motion for sanctions, (Doc. 31), of Defendant Entergy Nuclear Operations, Inc. ("Entergy"). For the reasons stated below, both motions are GRANTED.

I.     **BACKGROUND**

The facts set forth below are taken from the parties' Local Rule 56.1 Statements and supporting materials, and are undisputed unless otherwise noted.

Defendant operates the Indian Point Energy Center ("IPEC"), a power generating nuclear facility located in Buchanan, New York, under a license issued by the U.S. Nuclear Regulatory

1

Commission ("NRC"). (Doc. 46 ("P's 56.1 Stmt. & Resp.") ¶¶ 1-2.) Former Defendant Daniel

Gagnon has been employed by Defendant since 2008 as the Security Manager at IPEC. (Doc. 12

¶ 8.) Former Defendant Wayne Griffin has been employed by Defendant since 2011 as the

Supervisor of Access Authorization/Fitness for Duty at IPEC. (*Id.* ¶ 10.)

Plaintiff Harold Flores is employed by Defendant as an armed Nuclear Security Officer

("NSO") at IPEC. (P's 56.1 Stmt. & Resp. ¶ 1.) He was initially hired in April 2005, and with

the exception of a break in employment between May 2013 and October 2014, has held the same

position since then. (*Id.* ¶ 7.) As an NSO, his responsibilities include but are not limited to:

patrolling; controlling entry processing of individuals into protected areas; conducting personnel

and vehicle searches; securing, protecting and assisting at scenes of accidents, fires and similar

events; and conducting operational tests of intrusion detection and contraband detection systems.

(*Id.* ¶ 8.)

### A. NRC Regulations

As a nuclear plant operator, Defendant is required to adhere to numerous regulations

promulgated by the NRC. (*See id.* ¶¶ 3-5.) These regulations mandate, among other things, that

Defendant maintain a fitness-for-duty ("FFD") program and an unescorted access authorization

("UAA") program. *See* 10 C.F.R. §§ 26.21, 73.56 (2018).

The FFD program is designed to "[p]rovide reasonable assurance" that employees are

"trustworthy and reliable" and "are not under the influence of any substance, legal or illegal, or

mentally or physically impaired from any cause, which in any way adversely affects their ability

to safely and competently perform their duties." *Id.* § 26.23(a), (b). Those subject to the FFD

program include all persons who are granted UAA to protected areas of a nuclear power reactor

and perform security duties as an armed security officer. *Id.* § 26.4(a)(5).

The NRC further mandates that a licensee have an access authorization program that "provide[s] high assurance" that any persons granted UAA to sensitive areas of the plant "are trustworthy and reliable, such that they do not constitute an unreasonable risk to public health and safety or the common defense and security, including the potential to commit radiological sabotage." *Id.* § 73.56(c). If the licensee discovers potentially disqualifying FFD information relating to one of its employees, "to maintain the individual's authorization, . . . the licensee's . . . designated reviewing official [must] complete[] a review of the circumstances associated with the [potentially disqualifying FFD] information." *Id.* § 26.69(d)(1). The reviewing official may require an appropriate professional to undertake a "determination of fitness" to see if "the individual is fit to safely and competently perform his or her duties." *Id.* § 26.69(d)(2). One type of potentially disqualifying FFD information is "information demonstrating that an individual has [u]sed, sold, or possessed illegal drugs." *Id.* § 26.5. In the event that an individual's potentially disqualifying information is drug-related, "[i]f the reviewing official determines that maintaining the individual's authorization is warranted, [the licensee, shall] implement any recommendations for treatment and followup drug and alcohol testing from the determination of fitness, which may include the collection of urine specimens under direct observation, and ensure that the individual complies with and successfully completes the treatment plans." *Id.* § 26.69(d)(3).

## B. Plaintiff's Employment Prior to Termination

Between November 2007 and May 2013, Plaintiff was counseled, warned, reprimanded or suspended twenty-three times as a result of repeated performance issues, mostly tardiness and absenteeism. (*Id.* ¶¶ 10-33.)

On April 18, 2013, Plaintiff was arrested and charged with criminal possession of a controlled substance in the seventh degree. (*Id.* ¶ 34.) As a result of the arrest, Plaintiff's New York State pistol permit was suspended, rendering him unqualified to perform his job as an armed NSO. (*Id.* ¶ 36.)[1] In light of Plaintiff's inability to work as an armed NSO following his arrest, and as a result of Plaintiff's prior extensive disciplinary record, Gagnon and the Security Supervisor decided to terminate Plaintiff's employment on May 9, 2013. (*Id.* ¶ 37; Doc. 42 ("Kozak MSJ Aff.") Ex. HH at 2.) The decision was confirmed in a memorandum from Gagnon to Flores dated May 16, 2013. (P's 56.1 Stmt. & Resp. ¶ 38; Kozak MSJ Aff. Ex. II.) Plaintiff does not dispute that his employment was terminated on May 16, 2013, although he contends that he was not aware of that fact at the time. (P's 56.1 Stmt. & Resp. ¶ 39.)

On or about May 13, 2013, Plaintiff provided an affidavit in support of co-worker Kendric Lever's then-pending discrimination lawsuit against Defendant. (*Id.* ¶ 41.)[2] According to Plaintiff, Lever gave Plaintiff a prepared affidavit, which Plaintiff then signed. (*Id.* ¶ 42.) Plaintiff never told anyone at Entergy that he provided an affidavit in support of Lever's claim, nor does Plaintiff believe that Gagnon or Griffin had any reason to know that he provided the affidavit at the time of his termination. (*Id.* ¶ 43.)

### C. The Settlement of Plaintiff's Termination Grievance

As a NSO at IPEC, Plaintiff was and is a member of Local 456 of the International Brotherhood of Teamsters (the "Union"). (*Id.* ¶ 44.) On May 31, 2013, through his Union

---

[1] Plaintiff admits that the suspension of his state pistol permit rendered him unqualified to perform his job as an armed NSO. (*Id.* ¶ 36.) Elsewhere he seems to dispute that possession of a valid pistol permit is an essential precondition to being an armed NSO, (*id.* ¶ 9; Doc. 45 ("P's MSJ Opp.") at 7-8), and also argues that Defendant requiring it was retaliatory, (*see* P's MSJ Opp. at 7-8). Putting aside the inconsistency of Plaintiff's positions, the dispute is immaterial. Even if possession of a valid pistol permit was not an essential precondition to being an armed NSO, a retaliation claim based on this requirement would be time-barred, for the reasons discussed below.

[2] May 13, 2013 is the date the affidavit was filed and stamped in court; Plaintiff does not recall when he signed the affidavit. (*See* Kozak MSJ Aff. Ex. D ("P's Depo.") at 129:10-21.)

representative, Plaintiff grieved the termination. (*Id.* ¶ 45; Kozak MSJ Aff. Ex. JJ.) Plaintiff, through his attorney, served Defendant with a notice of intention to arbitrate on August 2, 2013, (Kozak MSJ Aff. Ex. KK at 2), and arbitration was scheduled for January 31, 2014, (P's 56.1 Stmt. & Resp. ¶ 47). In the meantime, on October 8, 2013, the charge against Plaintiff for criminal possession of a controlled substance was dismissed. (*Id.* ¶ 48.)

On January 31, 2014, Plaintiff and Defendant reached a settlement agreement (the "Settlement Agreement"), which fully and finally resolved the dispute and provided Plaintiff with a path to return to work as a NSO with his prior seniority, as long as Plaintiff accomplished certain enumerated preconditions. (*Id.* ¶¶ 49-50.) Pursuant to the Settlement Agreement, Plaintiff was required to obtain a valid Westchester County pistol permit by July 1, 2014 and meet all access requirements established by Defendant's access authorization department in accordance with company policy. (*Id.* ¶ 51.) The Settlement Agreement also provided that if Plaintiff satisfied these conditions, Defendant would reinstate Plaintiff to the NSO position, and the period from his termination until his reinstatement would be considered an unpaid leave of absence except for May 17, 2013, which would be considered a one-day unpaid disciplinary suspension. (*Id.*) But if Plaintiff failed to comply with its terms, he would not be reinstated. (*Id.*) Plaintiff spoke with his attorney before entering into the Settlement Agreement, understood and agreed to its terms, and voluntarily signed it. (*Id.* ¶ 52; P's Depo. at 144:21-23.)

### D. Plaintiff's Reinstatement

Plaintiff secured his pistol permit on July 3, 2014, two days after the July 1, 2014 deadline. (Kozak MSJ Aff. Ex. OO.) As a result, Defendant initially declined to reinstate Plaintiff. (*Id.*) But on September 3, 2014, Plaintiff obtained a judicial ruling from the Westchester County Court retroactively backdating Plaintiff's pistol permit to June 30, 2014.

(*Id.*)  Plaintiff was ultimately reinstated as a NSO in or about October 2014.  (P's 56.1 Stmt. & Resp. ¶ 56.)

### E.       Recommendations from an Independent Substance Abuse Expert

Because of Plaintiff's arrest, an independent substance abuse expert, Dr. Paul T. Seidenschnur, evaluated Plaintiff on May 2, 2013 to determine his FFD pursuant to Defendant's policy and NRC Regulations.  (*Id.* ¶ 62.)

In his May 2, 2013 report, Dr. Seidenschnur concluded that Plaintiff engaged in "risky behavior" and "used questionable judgment" with respect to the events leading up to his arrest for criminal possession of a controlled substance.  (*Id.* ¶ 63; Kozak MSJ Aff. Ex. PP at 3.) Nonetheless, Dr. Seidenschnur concluded that Plaintiff was "indeed fit for duty as long as he [wa]s compliant with the following recommendations:"  (1) participate in five to eight sessions of a psycho-educational program addressing alcohol and drug consumption practices and their effect; (2) regularly indicate compliance with the treatment; and (3) participate in intensified random follow-up drug testing (a minimum of twenty-nine tests over three years).  (P's 56.1 Stmt. & Resp. ¶ 63; Kozak MSJ Aff. Ex. PP at 3.)

On October 2, 2014, Dr. Siedenschnur modified his recommendation, in light of the dismissal of Plaintiff's 2013 criminal charge, reducing the number of psycho-educational program sessions to three to five and reducing the number of drug tests to a minimum of twelve. (Kozak MSJ Aff. Ex. QQ.)  Griffin communicated these recommendations to Plaintiff by letter dated October 9, 2014.  (P's 56.1 Stmt. & Resp. ¶ 66.)  Plaintiff understood that Griffin was required to follow to Dr. Seidenschnur's recommendations so Plaintiff could maintain UAA.  (*Id.* ¶ 67.)

**F.** **Plaintiff's Conduct Leading Up to the December 2015 Suspension**

In or about August 2015, Plaintiff was issued a summons for possessing an open container of alcohol while sitting on a friend's porch and was ordered to appear in court on September 24, 2015. (*Id.* ¶¶ 69-70.) Plaintiff failed to report to Defendant both the fact that he received the open container summons and the September 24, 2015 court date. (*Id.* ¶ 71.)

Plaintiff failed to report to work on September 24, 2015, and missed a scheduled annual physical examination that was necessary for him to maintain his NSO qualification. (*Id.* ¶ 72.) Plaintiff knew that he was scheduled for the physical on that date. (*Id.* ¶ 73.)

Additionally, in early October 2015, Plaintiff was scheduled to take an annual exam – known as the RAD exam – that NSOs are required to pass. (*Id.* ¶ 74.) NSOs have three opportunities to pass this exam. (*Id.* ¶ 75.) Each time a NSO fails the exam, he is required to report the failure to a supervisor prior to retaking the exam. (*Id.*) The consequence for failing a third time is termination from employment because of the inability to obtain a necessary qualification. (*Id.* ¶¶ 76, 79.)

On October 7 and 8, 2015, fact finding meetings were conducted concerning Plaintiff's failed RAD worker exams. (*Id.* ¶ 77.) The fact finding meetings revealed that Plaintiff failed his first attempt at the exam, but instead of reporting the failure to his supervisor as required, he took the exam a second time immediately thereafter and failed again. (*Id.* ¶ 78.)

On October 12, 2015, Plaintiff failed to attend scheduled shooting range training. (*Id.* ¶ 80.) Plaintiff claimed that a supervisor told him that he was not required to go to the range, but a fact finding determined that Plaintiff was never told that he should skip the shooting range training. (*Id.*) As a result of these four performance and communications issues, Defendant suspended Plaintiff for three days on December 7, 2015. (*Id.* ¶ 81; Kozak MSJ Aff. Ex. XX.)

Plaintiff challenged the suspension by filing a grievance through his Union representative.  (P's 56.1 Stmt. & Resp. ¶ 82; Kozak MSJ Aff. Ex. ZZ.)

### G.     Plaintiff Enrolls in the Substance Abuse Program

Between October 2014 and September 2016, Plaintiff was selected for drug testing on eight occasions.  (P's 56.1 Stmt. & Resp. ¶ 91.)  Plaintiff contends that he was directed to go for these tests in the presence of other NSOs, and that certain unnamed peers made comments asking him whether he was a drug addict or whether he wanted them to take the drug test for him.  (*Id.* ¶¶ 84-85.)  At his deposition, Plaintiff was initially unable to recall the identity of any supervisor who allegedly publicly notified him to submit to a random drug test.  (*Id.* ¶ 86.)  In response to Defendant's counsel's request to provide him with the name of just one lieutenant who allegedly publicly notified him to submit to a drug test, Plaintiff responded "I'd say Lieutenant Bauman." (*Id.* ¶ 87.)  Plaintiff was unable to recall any dates when Lieutenant Bauman allegedly asked him in the presence of others to submit to a drug test.  (*Id.* ¶ 88.)  Plaintiff also was unable to identify the name of a single co-worker whom he claims teased him for having to submit to drug tests. (*Id.* ¶ 89.)  Plaintiff acknowledged that his co-workers regularly joke around and that he has never complained to anyone at Entergy about being offended by coworkers' comments.  (*Id.* ¶ 90.)

### H.     Procedural Posture

On April 12, 2016, Plaintiff filed a discrimination charge with the New York State Division of Human Rights ("NYSDHR"), which was deemed dual-filed with the U.S. Equal Employment Opportunity Commission ("EEOC").  (*Id.* ¶ 92; Kozak MSJ Aff. Ex. YY ("Discrimination Charge").)  The Discrimination Charge alleged that Defendant took multiple employment actions against Plaintiff for "submit[ing] an Affidavit in support of . . . Lever's

lawsuit" against Defendant: terminating Plaintiff's employment; inducing Plaintiff to enter into the Settlement Agreement; requiring Plaintiff to participate in psycho-educational sessions and random drug testing; subjecting Plaintiff to "numerous groundless and harassing" fact findings since October 2014; regarding Plaintiff as a drug or alcohol addict; rescheduling the date for Plaintiff's mandatory physical examination while he was away on vacation; and suspending Plaintiff for three days "without any lawful basis." (Discrimination Charge at 1-2.)

Plaintiff filed his Complaint in this case on September 16, 2016 against Entergy, Griffin, and Gagnon. (Doc. 5 ("Complaint").) The Complaint alleged claims for retaliation against Entergy, Gagnon, and Griffin, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.*; discrimination against Entergy under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*; and retaliation and discrimination against Entergy, Gagnon, and Griffin, in violation of the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. L. § 290 *et seq.* (Complaint ¶¶ 71-80.)

The Court held a pre-motion conference on September 27, 2017 to discuss Defendants' proposed motion for summary judgment and a discovery issue discussed below. (Minute Entry dated Sept. 27, 2017.) Following the conference, the claims against Gagnon and Griffin were voluntarily dismissed. (Doc. 28.) Entergy submitted its motion for summary judgment on November 8, (Docs. 37, 40 ("D's MSJ Mem.")), Plaintiff opposed on December 6, (Doc. 45), and Entergy replied on December 20, (Doc. 47).

## I.      Background on Discovery

On May 9, 2017, Plaintiff's deposition ended at 3:00 P.M. after Plaintiff advised counsel that he had not slept the night before (because he had worked the night shift) and that he was

scheduled to work the night shift again that later that day.  (Doc. 32 ("Kozak Sanctions Aff.")

¶ 5.)  The parties agreed to continue Plaintiff's deposition on June 12, 2017.  (*Id.* ¶ 4.)

On June 12, 2017 at 7:32 a.m., Plaintiff's counsel sent a text message to Defendant's

counsel informing him that Plaintiff would not be able to attend his deposition scheduled for

later that morning.  (*Id.* ¶ 3.)  The reason for Plaintiff's absence was that he "worked 12 hour

shifts for 6 out of the last 7 days and [wa]s fatigued."  (*Id.*)

Following Plaintiff's cancellation of the June 12 deposition, Defendant's counsel notified

Plaintiff's counsel that Defendant intended to recoup the costs, attorney and paralegal fees, and

court reporter cancellation fee associated with Plaintiff's late cancellation, totaling $1,137.50.

(*Id.* ¶ 6.)  On June 16, 2017, Defendant's counsel submitted a letter requesting a pre-motion

conference, or in the alternative, leave to file a motion for costs and fees resulting from the

cancellation.  (Doc. 19.)  The Court held a pre-motion conference on July 13, 2017, (Minute

Entry dated July 13, 2017), and encouraged the attorneys for both sides to attempt to reach an

agreement to avoid motion practice.  (Kozak Sanctions Aff. ¶ 8.)  Subsequently, through counsel,

the parties agreed that Plaintiff would pay $500, (*id.*), and by letter dated July 26, 2017,

Defendant notified the Court that the parties had resolved the issue, (Doc. 22).

But Plaintiff never made the payment, (Kozak Sanctions Aff. ¶ 10), and Defendant

notified the Court of Plaintiff's failure to abide by the agreement at the September 27, 2017 pre-

motion conference, (Minute Entry dated Sept. 27, 2017).  At the conference, the Court granted

Defendant leave to file a motion for sanctions.  (*Id.*; Docs. 29, 30.)  Defendant submitted its

motion on November 1, 2017, (Doc. 31), Plaintiff opposed on November 8, (Doc. 36 ("P's

Sanctions Opp.")), and Defendant replied on November 22, (Doc. 43 ("D's Sanctions Reply")).

Defendant claims to have incurred the following fees based on Plaintiff's cancellation of his June 12, 2017 deposition: (1) Attorney Jonathan Kozak spent 1.8 hours preparing for the June 12 deposition and an additional .3 hours addressing the cancellation while a paralegal spent .5 hours addressing the cancellation; (2) an associate attorney spent 1.8 hours preparing the pre-motion letter dated June 16, 2017; (3) Kozak spent 1 hour preparing for and attending the July 13, 2017 conference; and (4) an associate attorney spent 3.2 hours preparing the instant motion for sanctions. (Kozak Sanctions Aff. ¶ 13.)[3] Kozak's billing rate is $475 per hour, while the rate for associate attorneys is $295 per hour and for paralegals $100 per hour. (*Id.* ¶ 14.)

## II.    DEFENDANT'S MOTION FOR SANCTIONS

### A.    Legal Standard

Rule 37(d) provides that the court can order a sanction when "a party. . . fails, after being served with proper notice, to appear for that person's deposition." Fed. R. Civ. P. 37(d)(1)(A)(i). "Sanctions may include any of the orders listed in Rule 37(b)(2)(A)(i)-(vi)," but "must require the party failing to act . . . to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust." *Id.* 37(d)(3). "A failure described in Rule 37(d)(1)(A) is not excused on the ground that the discovery sought was objectionable, unless the party failing to act has a pending motion for a protective order under Rule 26(c)." *Id.* 37(d)(2). "If a [c]ourt grants a motion made under Rule 37(d), it has broad discretion to impose sanctions it considers just . . . ." *Handwerker v. AT & T Corp.*, 211 F.R.D. 203, 208 (S.D.N.Y. 2002).

The burden of proof is on the nonmovant to show "'that his failure is justified or that special circumstances make an award of expenses unjust.'" *Novak v. Wolpoff & Abramson LLP*,

---

[3] Apparently Plaintiff's counsel paid the court reporter's cancellation fee. (Kozak Sanctions Aff. at 3 n.1.)

536 F.3d 175, 178 (2d. Cir 2008) (quoting Fed. R. Civ. P. 37(b) advisory committee's note to 1970 amendments). "Conduct is substantially justified if there was a genuine dispute or if reasonable people could differ as to the appropriateness of the contested action." *Klein v. Torrey Point Grp., LLC*, 979 F. Supp. 2d 417, 442 (S.D.N.Y. 2013) (internal quotation marks omitted). "It is well-established, however, that a party applying for sanctions under Rule 37(d) is not required to prove that the party who failed to attend the deposition acted in bad faith." *John Wiley & Sons, Inc. v. Book Dog Books, LLC*, 298 F.R.D. 145, 149 (S.D.N.Y. 2014) (citing *Blauinsel Stiftung v. Sumitomo Corp.*, No. 99-CV-1108, 2001 WL 1602118, at *7 (S.D.N.Y. Dec. 14, 2001) ("[A] finding of bad faith is not a prerequisite to the imposition of sanctions under Rule 37(d).") (alteration in original)).

**B.     Analysis**

Plaintiff fails to provide a substantial justification for his failure to attend his deposition on June 12, 2017. Plaintiff explains that he cancelled because he was tired due to his demanding schedule, (*see* P's Sanctions Opp. at 3), but he does not explain how that meets the substantial justification standard. As Defendant notes, Plaintiff did not attempt to reschedule the deposition before the morning it was to take place. (D's Sanctions Reply at 2). Plaintiff's employer was willing to allow Plaintiff to request time off as necessary to participate in this litigation, but Plaintiff failed to make any such request. (Doc. 19 at 2.) Plaintiff knew the demands of his employment when the parties scheduled the deposition; he had over a month's notice of the date; and he does not argue that any special circumstances made his post-work fatigue on June 12, 2017 unexpected. And Plaintiff's conduct is particularly glaring considering that "his failure to properly plan his schedule caused the early termination of the first day of his deposition." (D's Sanctions Reply at 2.) Thus, Plaintiff has not met his burden in providing substantial

justification for his failure to attend his June 12 deposition, and the imposition of fees is appropriate.[4]

Defendant's fee application appears to identify tasks that are, for the most part, a result of Plaintiff's cancellation of his deposition. Not all of the time preparing for the deposition, however, was caused by Plaintiff's cancellation. *See Montesa v. Schwartz*, No. 12-CV-6057, 2015 WL 13173166, at *4 (S.D.N.Y. Oct. 13, 2015) ("[T]he time 'preparing' for each deposition does not adequately represent expenses 'caused' by the late-noticed cancellations.") (quoting *John Wiley & Sons, Inc.*, 298 F.R.D. at 149). Nonetheless, the cancellation of the deposition meant that Defendant's counsel had to repeat some of his preparation in advance of a rescheduled deposition, which occurred on July 25, 2017. (Kozak MSJ Aff. ¶ 6 (noting dates of Plaintiff's deposition).) Therefore, Defendant will be compensated for thirty percent of the time counsel devoted to preparation for the June 12 deposition. *See Sang Lan v. Time Warner, Inc.*, No. 11-CV-2870, 2015 WL 2078385, at *1 (S.D.N.Y. May 4, 2015) (compensating counsel thirty percent of time counsel devoted to preparing for cancelled deposition because counsel would "have to repeat some of their preparation in advance of a rescheduled deposition").

In sum, the Court grants Defendant's request for compensation for the following: (1) 1.84 Kozak hours (.54 hours preparing for the deposition, .3 hours responding to the cancellation, and 1 hour preparing for and attending the July 17 pre-motion conference); (2) 5 associate hours (1.8 hours preparing the pre-motion letter and 3.2 hours preparing the sanctions motion); and (3) .5 paralegal hours (responding to the cancellation). Next, the Court finds that the billable rates that Defendant provides reasonable: $475 per hour for Kozak; $295 per hour

---

[4] Under Rule 37(d)(3), the sanction may be imposed on the party, his counsel, or both. Here, there is no indication that counsel bore any responsibility for Plaintiff's failure to attend, and thus the payment must be made by Plaintiff.

for associate attorneys; and $100 per hour for paralegals.  *See Vaigasi v. Solow Mgmt. Corp.*, No. 11-CV-5088, 2017 WL 3868990, at *4 (S.D.N.Y. Sept. 5, 2017) (identifying hourly fee rates of $250-$600, $200-$350, and $100-$200 as reasonable fee rates for experienced employment law litigators, associates, and paralegals, respectively).[5]  Based on the determinations above, Defendant's fee award as a result of the Plaintiff's cancellation of his June 12 deposition totals $2,399.00.[6]

## III.     DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### A.     Legal Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[T]he dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the outcome of the suit under the governing law . . . .  Factual disputes that are irrelevant or unnecessary will not be counted."  *Id.*

On a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 255.  The movant bears the initial burden of demonstrating "the absence of a genuine issue of material fact," and, if satisfied, the burden then shifts to the non-movant to present "evidence sufficient to satisfy every element of the claim."  *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).  "The mere existence of a scintilla of evidence in support

---

[5] Plaintiff does not object to Defendant's hours or hourly rates.

[6] In light of the circumstances, including my disposition below, I decline in my discretion, *see S. New England Tel. Co. v. Glob. NAPs Inc.*, 624 F.3d 123, 143-44 (2d Cir. 2010), to impose a sanction beyond the imposition of fees.

of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252. Moreover, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and he "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (internal quotation marks omitted).

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1). Where an affidavit is used to support or oppose the motion, it "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4); *see Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008). In the event that "a party fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court may," among other things, "consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(2)-(3).

### B.     ADA Discrimination

The ADA aims to prevent discrimination "against a qualified individual on the basis of disability in regard to," among other things, "privileges of employment." 42 U.S.C. § 12112(a). Claims under the ADA are analyzed under the familiar burden-shifting framework established by

the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 96 (2d Cir. 2009). "A plaintiff must establish a *prima facie* case; the employer must offer through the introduction of admissible evidence a legitimate non-discriminatory reason for the [adverse decision(s)]; and the plaintiff must then produce evidence and carry the burden of persuasion that the proffered reason is a pretext." *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006) (emphasis added).

To establish a *prima facie* case of discrimination based on disability, a plaintiff must show: "'(1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA [or regarded as disabled]; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered [an] adverse employment action because of his disability.'" *Cameron v. Cmty. Aid for Retarded Children, Inc.*, 335 F.3d 60, 63 (2d Cir. 2003) (second alteration in original) (quoting *Giordano v. City of N.Y.*, 274 F.3d 740, 747 (2d Cir. 2001)).

Defendant argues that Plaintiff's ADA claim should be dismissed for three reasons: (1) Plaintiff was never disabled nor perceived as being disabled; (2) Plaintiff never experienced any adverse employment action as a result of an alleged perceived disability; (3) there is a legitimate non-discriminatory reason for the alleged adverse employment actions that Plaintiff experienced and there is no evidence of pretext. (D's MSJ Mem. at 13-19.) Plaintiff appears to concede the point that Defendant took no action against him, noting that discovery revealed that the action of which Plaintiff complains – random drug testing over a three-year period – was a decision made by the independent substance abuse expert, and that Defendant was required under 10 C.F.R. § 26.69 to implement the expert's recommendation. (P's MSJ Opp. at 3.) This concession is the only point Plaintiff makes in his brief with regard to the ADA claim, which I assume means that

Plaintiff does not still press that claim. Even if he were pursuing it, and even if the random drug testing constituted an adverse employment action, Plaintiff's ADA claim fails for two other reasons.

First, there is no evidence that Plaintiff was disabled or that Defendant regarded Plaintiff as such. "Disability" means "a physical or mental impairment that substantially limits one or more [of an individual's] major life activities," "a record of such impairment," or "being regarded as having such an impairment." 42 U.S.C. § 12102(1). To be "regarded as having such an impairment," an individual must "establish[] that he or she has been subjected to an action prohibited under [the ADA] because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." *Id.* § 12102(3)(A). Here, Plaintiff asserts that he was regarded as being disabled by drug addiction, but he points to no facts in support of this assertion. (P's MSJ Opp. at 3.) *See Koenig v. City of New Haven*, No. 13-CV-1870, 2015 WL 5797011, at *3 (D. Conn. Oct. 1, 2015) ("To the extent that [plaintiff] attempts to allege a 'regarded as' ADA claim, his allegations are conclusory and not supported by sufficient facts . . . .").

Second, it is undisputed that Plaintiff was required to undergo random drug testing because Defendant received potentially disqualifying fitness for duty information following Plaintiff's arrest for criminal possession of a controlled substance. *See* 10 C.F.R. §§ 26.69(d)(1)-(3). Compliance with mandatory federal regulations, such as NRC's regulations, is considered a legitimate non-discriminatory reason. *See Stevens v. S. Nuclear Operating Co.*, 209 F. Supp. 3d 1372, 1379 (S.D. Ga. 2016) (finding legitimate, non-discriminatory reason where nuclear energy facility-defendant removed NSO from work because she was not fit for duty under NRC regulations); *Smith v. United Parcel Serv., Inc.*, No. CIV. 04-CV-3812, 2006 WL 3327072, at

*10 (N.D. Ga. July 10, 2006) (finding legitimate, non-discriminatory reason where delivery company-defendant removed driver from position because he lost Department of Transportation certification). Plaintiff makes no argument for pretext in response. As a result, Plaintiff's ADA claim is dismissed.

### C. Title VII Retaliation

Defendant moves for summary judgment on Plaintiff's Title VII retaliation claim because it is time-barred and fails on the merits. (D's MSJ Mem. at 11-12, 19-25.)

#### 1. Timeliness

Title VII requires claimants to file a charge of retaliation with the EEOC within 300 days of the retaliatory act. *See* 42 U.S.C. § 2000e-5(e)(1). Plaintiff's Discrimination Charge to the NYSDHR – which was deemed dual-filed with the EEOC – was filed on April 12, 2016, and thus the limitations period in his case began 300 days earlier, on June 17, 2015.

Under the continuing violation exception to the Title VII limitations period – a "disfavored" principle, *Sherman v. Nat'l Grid*, 993 F. Supp. 2d 219, 225 (N.D.N.Y. 2014) – "if a Title VII plaintiff files an EEOC charge that is timely as to any incident of discrimination in furtherance of an ongoing policy of discrimination, [then] all claims of acts of discrimination under that policy will be timely even if they would be untimely standing alone." *Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 155-56 (2d Cir. 2012) (internal quotation marks omitted). "The continuing violation exception applies to cases involving specific discriminatory policies or mechanisms such as discriminatory seniority lists or discriminatory employment tests." *Lambert v. Genesee Hosp.*, 10 F.3d 46, 53 (2d Cir. 1993) (citation omitted), *overruled on other grounds by Greathouse v. JHS Sec. Inc.*, 784 F.3d 105 (2d Cir. 2015), and *abrogated on other grounds by Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1 (2011). "However, multiple

incidents of discrimination, even similar ones, that are not the result of a discriminatory policy or mechanism do not amount to a continuing violation." *Id.*

Plaintiff claims that his Discrimination Charge alleged "an ongoing retaliatory course of conduct" because it contained allegations within the statutory period and the allegations that fell outside of the statutory period "were of the same nature as those within." (P's MSJ Opp. at 4-5.) The Court disagrees. Plaintiff alleges discrete instances of retaliatory action, not a "specific discriminatory polic[y] or mechanism[]." *Lambert*, 10 F.3d at 53. The out-of-period actions Plaintiff alleged in both his Discrimination Charge and his opposition brief – the termination, the alleged fraudulent inducement to enter into the Settlement Agreement, and the random drug testing requirement – are discrete acts that trigger their own 300-day clocks. *See Edner v. NYCTA-MTA*, 134 F. Supp. 3d 657, 664 (E.D.N.Y. 2015) (characterizing termination, disparate disciplining, and negative performance evaluations as discrete acts) (collecting cases); *E.E.O.C. v. U.S. Steel Corp.*, No. 10-CV-1284, 2012 WL 3017869, at *7 (W.D. Pa. July 23, 2012) ("Drug tests, drug residue screenings and termination of employment are discrete acts as they occur on a readily identifiable date certain and each constitutes a separate employment practice."). Accordingly, in considering Plaintiff's retaliation claim, the Court disregards allegedly retaliatory events occurring before June 17, 2015.

  2.  Merits

Retaliation claims are analyzed using the *McDonnell Douglas* burden-shifting framework. *See Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005); *Cruz v. Oxford Health Plans, Inc.*, No. 03-CV-8863, 2008 WL 509195, at *10 (S.D.N.Y. Feb. 26, 2008). A plaintiff bears the initial burden of establishing a *prima facie* case of retaliation, and the burden of proof at this stage is "'de minimis.'" *Moccio v. Cornell Univ.*, 889 F. Supp. 2d 539,

582 (S.D.N.Y. Aug. 27, 2012) (quoting *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010)).

"[B]ut it is not non-existent." *Pleener v. N.Y.C. Bd. of Educ.*, No. 05-CV-973, 2007 WL

2907343, at *11 (E.D.N.Y. Oct. 4, 2007) (internal quotation marks omitted), *aff'd*, 311 F. App'x

479 (2d Cir. 2009) (summary order). If the plaintiff meets this burden, the defendant must offer

a legitimate, non-retaliatory reason for its actions. *Moccio*, 889 F. Supp. 2d at 582-83. "If the

employer produces evidence of a non-retaliatory justification for the adverse employment

action," the plaintiff must demonstrate that there is sufficient evidence for a reasonable juror to

find that the reason offered by the defendant is pretext for retaliation. *Id.*

To establish a *prima facie* case of retaliation, Plaintiff must show that: (1) he was

engaged in activity protected under anti-discrimination statutes; (2) Defendant was aware of

Plaintiff's participation in the protected activity; (3) Defendant took adverse action against

Plaintiff; and (4) there is a causal connection between Plaintiff's protected activity and the

adverse action taken by Defendant. *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d

712, 720 (2d Cir. 2010). To establish an adverse employment action, "a plaintiff must show that

a reasonable employee would have found the challenged action materially adverse, which . . .

means it well might have dissuaded a reasonable worker from making or supporting a charge of

discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal

quotation marks omitted). A plaintiff may establish the causal connection indirectly by showing

that the protected activity was closely followed by the retaliation, or directly by showing

evidence of retaliatory animus. *See Cosgrove v. Sears, Roebuck & Co.*, 9 F.3d 1033, 1039 (2d

Cir. 1993).

Plaintiff claims that Defendant retaliated against him after he provided an affidavit on

May 13, 2013 in support of a co-worker's anti-discrimination lawsuit. (P's MSJ Opp. at 6-7.)

Specifically, Plaintiff argues that Defendant subjected him to the following retaliatory acts: (1) termination of employment on May 9, 2013; (2) false inducement in January 2014 of entry into the Settlement Agreement waiving any legal claim to back pay in reliance on a purported requirement that Plaintiff have a New York State pistol license in order to perform the duties of his position as an NSO; (3) random drug testing for three years; (4) fact findings and suspensions since October 2014; and (5) negative comments from his peers related to the intensified drug testing. (*Id.* at 6-9.) The Court will not consider the first two items because they are time-barred for the reasons stated above. Nor will the Court consider the third item, because Plaintiff concedes that the independent substance abuse expert set forth the parameters for Plaintiff's fitness to return to work, which included intensified random drug testing. (*Id.* at 8.) Thus, the drug testing requirement cannot be attributed to Defendant. (*Id.*)[7] And the fifth item, the negative comments from peers, lacks the requisite specificity to be considered the basis for finding an adverse employment decision. *See Dickens v. Hudson Sheraton Corp., LLC*, 167 F. Supp. 3d 499, 519 n.14 (S.D.N.Y. 2016) ("[Plaintiff's] allegations of workplace teasing and harassment and defendants' failure to remedy the same are so fatally lacking in detail that they cannot be the basis for finding an adverse employment decision."), *aff'd*, 689 F. App'x 670 (2d Cir. 2017) (summary order), *cert. denied*, 138 S. Ct. 335 (2017), *reh'g denied*, 138 S. Ct. 942 (2018). There is also no basis to attribute this conduct to Defendant. *See Lotocky v. Elmira City Sch. Dist.*, 149 F. Supp. 3d 429, 435 (W.D.N.Y. 2015) (assuming co-worker comments were adverse, no basis for imputing them to employer where plaintiff never reported them). That leaves four potential retaliatory actions: the fact finding meetings from October 7, 8, and 12,

---

[7] Even if the drug testing requirement could be attributed to Defendant, Defendant had a legitimate non-retaliatory reason for imposing the drug testing requirement, as discussed above: compliance with NRC regulations.

2015, and the December 7, 2015 suspension. Plaintiff cannot sustain a retaliation claim based on those events, however, for two reasons.[8]

First, Plaintiff cannot demonstrate a causal connection between his protected activity and any adverse employment action. Because "a direct showing [of retaliatory animus] requires [P]laintiff to provide 'tangible proof' of retaliatory animus, 'conclusory assertions of retaliatory motive' are insufficient." *Smith v. Cty. of Suffolk*, 776 F.3d 114, 118-19 (2d Cir. 2015) (*per curiam*) (quoting *Cobb v. Pozzi*, 363 F.3d 89, 108 (2d Cir. 2004)). Plaintiff's assertion that the fact findings and suspension were "in retaliation for having engaged in protected activity" is wholly conclusory. (P's MSJ Opp. at 9.) And no reasonable juror could glean a causal connection from temporal proximity because there is more than a two-year gap between the protected activity and the alleged retaliatory actions. *See Hollander v. Am. Cyanamid Co.*, 895 F.2d 80, 85-86 (2d Cir. 1990) (upholding district court's grant of summary judgment on retaliation claim where three months between protected activity and termination, and plaintiff submitted no other evidence of causal nexus); *Walcott v. Cablevision*, No. 10-CV-2602, 2012 WL 4447417, at *14 (E.D.N.Y. Sept. 24, 2012) ("District courts in the Second Circuit have consistently held that a passage of more than two months between the protected activity and the adverse employment action does not allow for an inference of causation.") (internal quotation marks omitted) (collecting cases). So Plaintiff's *prima facie* case fails.

Second, even if it did not, Defendant has articulated legitimate non-retaliatory reasons for Plaintiff's fact findings and suspension: Plaintiff's unscheduled absences and failure to follow Defendant's policy. *See Henny v. N.Y.S. Office of Mental Health*, 842 F. Supp. 2d 530, 554 (S.D.N.Y. 2012) ("Plaintiff's lateness and absences certainly suffice to establish a legitimate,

---

[8] The Court assumes, without deciding, that the fact finding meetings were adverse actions – a dubious proposition. *See Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 569-70 (2d Cir. 2011).

non-discriminatory reason for her treatment.") (collecting cases); *Brown v. The Pension Bds.*, 488 F. Supp. 2d 395, 406 (S.D.N.Y. 2007) ("Certainly, an employer is entitled to [take disciplinary action against] an employee who fails to follow company rules and fails to appear for work without notification . . . .") (internal quotation marks omitted). Specifically, the fact findings on October 7 and 8 occurred after Plaintiff failed to follow the procedure to notify a supervisor before retaking the RAD exam a second time. (P's 56.1 Stmt. & Resp. ¶ 77.) The October 12 fact finding occurred after Plaintiff was a no-show for a scheduled shooting range training. (*Id.* ¶ 80.) And the suspension occurred in light of these missteps, in addition to Plaintiff's failure to appear for his scheduled physical exam and his failure to notify Defendant of his open container summons and court date. (*See* Kozak MSJ Aff. Ex. XX.) Defendant therefore has satisfied its burden of production.

Plaintiff, in response, makes no attempt to show that the reasons offered for the fact findings and suspension were a pretext for retaliation. A jury could not reasonably find on this record that retaliation was a motivating factor in Defendant's employment decisions. Thus, Plaintiff's retaliation claim is dismissed.

### D.    NYSHRL Claims

In addition to his statutory claims under federal law, Plaintiff further alleges that his rights were violated under New York law. The "traditional 'values of judicial economy, convenience, fairness, and comity'" weigh in favor of declining to exercise supplemental jurisdiction where all federal-law claims are eliminated before trial. *Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)). Having determined that Plaintiff's Title VII and ADA claims should be

dismissed, this Court declines to exercise supplemental jurisdiction over Plaintiff's remaining NYSHRL claims. *See id.* (citing 28 U.S.C. § 1367(c)(3)).

## IV.  <u>CONCLUSION</u>

For the foregoing reasons, Defendant's motion for summary judgment is GRANTED, and Defendant's motion for sanctions is GRANTED insofar as the Court awards Defendant $2,399.00 in attorneys' fees pursuant to Rule 37. Plaintiff's federal claims are DISMISSED with prejudice and his state claims are DISMISSED without prejudice. Plaintiff shall pay the sanctions award of $2,399.00 to Defendant by July 16, 2018, unless he submits a financial affidavit (listing all income, expenses, assets, and liabilities) and a proposed payment schedule by July 2, 2018, in which case the Court will consider letting Plaintiff pay in installments. The Clerk of Court is respectfully directed to terminate the pending motions, (Docs. 31, 32, 33, 37), enter judgment for Defendant, and close the case.

**SO ORDERED.**

Dated: May 31, 2018
      White Plains, New York

_____
    CATHY SEIBEL, U.S.D.J.